2001 UT 44

**Linda Kay CLARK, Plaintiff and Respondent,**

v.

**Cecil E. CLARK, Defendant and Petitioner.**

No. 20000276.

Supreme Court of Utah.

June 5, 2001.

Rehearing Denied July 26, 2001.

Suzanne Marelius, Salt Lake City, for plaintiff.

Mary C. Corporon, Salt Lake City, for defendant.

DURHAM, Justice:

¶ 1 Defendant Cecil E. Clark (Cecil) seeks certiorari review of the court of appeals' memorandum decision in favor of plaintiff Linda Kay Clark (Linda). The court of appeals affirmed the trial court's finding of an unsolemnized marriage pursuant to section 30–1–4.5 of the Utah Code and reversed the trial court's granting of Cecil's motion for relief from judgment due to lack of jurisdiction. We affirm.

## BACKGROUND

¶ 2 Linda and Cecil had an eighteen-year solemnized marriage, which ended in divorce on August 27, 1985. Just a few months after the divorce was granted, Linda and Cecil resumed living together in late October or early November 1985. They continued to live together for a period of eleven years until August 1996. From December 1995 until June 1996, Linda resided in a separate apartment. She moved back in with Cecil, however, in June 1996, and they continued to live together until August 28, 1996, when a final separation occurred.

¶ 3 In October 1996, Linda brought this action against Cecil to establish an unsolemnized marriage, obtain a divorce, and divide marital assets. Cecil, however, delayed in providing discovery in the matter, even after two motions to compel. Therefore, Commissioner Lisa A. Jones held a hearing on April 17, 1997, and ruled that Cecil's failure to provide discovery would result in his pleadings being stricken and a default judgment entered against him if complete discovery was not forthcoming.

¶ 4 On May 15, 1997, in response to Commissioner Jones' ruling, Linda submitted a set of findings of fact and conclusions of law, declaration of marriage, and decree of divorce, which were placed in the record, unsigned. On the same day, Linda filed a motion for entry of decree and findings and a notice to submit for decision. Commissioner Jones stayed Linda's motion on June 30, 1997, and ordered that records sought by Linda be delivered to Linda's counsel the following day. The next day, July 1, 1997, Commissioner Jones certified the case for trial for determination of, among other things, whether an unsolemnized marriage existed, and to consider Cecil's contempt for "violation of restraint on assets." To expedite matters, Commissioner Jones suggested, in her minute entry, that the district court hold a bifurcated hearing to determine the marriage issue, noting that "the statutory limit on establishment of a marriage is looming."

¶ 5 On the date of trial, August 13, 1997, the district court found in a minute entry that "the statutory requirements have been met and a common-law marriage existed up to August of 1996 when the parties separated." However, the findings of fact and conclusions of law were not entered at that time.

¶ 6 The record indicates that counsel for Linda prepared findings of fact and conclusions of law, which were sent to opposing

counsel on August 26, 1997. The documents had to be revised, however, based on changes requested by Cecil's counsel. The revised copies were sent for approval to Cecil's counsel on September 10, 1997, but Cecil did not give approval. Thereafter, as no objection had been filed, counsel for Linda transmitted the documents to the court, which entered the findings and declaration of marriage on September 29, 1997. The findings specified that the Clarks' unsolemnized marriage had ended on August 28, 1996.

¶ 7 After the findings and declaration of marriage were entered, Cecil moved the court for relief from the judgment,[1] claiming that the court lacked jurisdiction because the court order establishing a common law marriage was not entered within one year following the termination of the Clarks' relationship as required by section 30–1–4.5. Subsection two provides in relevant part that "[t]he determination or establishment of a marriage under this section must occur during the relationship described in subsection (1), *or within one year following the termination of that relationship.*" Utah Code Ann. § 30–1–4.5(2) (1998) (emphasis added). The district court granted Cecil's motion, concluding that it was without jurisdiction to enter the order later than one year after the termination of the relationship. Both parties appealed to the court of appeals.

## STANDARD OF REVIEW

 ¶ 8 "On a writ of certiorari, we review the decision of the court of appeals, not that of the district court, and apply the same standard of review used by the court of appeals." *Coulter & Smith, Ltd. v. Russell,* 966 P.2d 852, 855 (Utah 1998) (citing Utah Code Ann. § 78–2–2(3)(a) (1996); *Hebertson v. Willowcreek Plaza,* 923 P.2d 1389, 1392 (Utah 1996); *Butterfield v. Okubo,* 831 P.2d 97, 101 n. 2 (Utah 1992)). We review the court of appeals' decision for correctness. *See Bear River Mut. Ins. Co. v. Wall,* 1999 UT 33, ¶ 4, 978 P.2d 460 (citing *State v. Harmon,* 910 P.2d 1196, 1199 (Utah 1995)).

The correctness of the court of appeals' decision turns on whether it accurately reviewed the trial court's decision under the appropriate standard of review. *See Newspaper Agency Corp. v. Audit. Div.,* 938 P.2d 266, 267 (Utah 1997).

## ANALYSIS

### I. ADJUDICATION REQUIREMENT OF SECTION 30–1–4.5

 ¶ 9 Subsequent to oral argument to the court of appeals in this case, we decided *In re Marriage of Gonzalez,* 2000 UT 28, 1 P.3d 1074, which construed subsection two of section 30–1–4.5 as "requir[ing] only the *filing* of a petition for adjudication of marriage within one year after the termination of the relationship." *Id.* at ¶ 30 (emphasis in original). *Gonzalez* raised the question of whether the legislature intended the unusual language of section 30–1–4.5 to be construed contrary to conventional statutes of limitation that limit the period to commence an action, not the period within which a court must reach final judgment. *See id.* at ¶ 24. We ruled that "[t]he legislature should not be deemed to have created such a potentially unfair rule without clear and convincing language evidencing its intent to do so . . . ." *Id.* (noting that "the ambiguities created in this statute appear to be the result of nothing more than inartful drafting"). Therefore, we turned to the legislative intent and purpose in enacting the statute. *See id.* at ¶ 23 ("When doubt or uncertainty exists as to the meaning or application of an act's provisions, an analysis of the act in its entirety should be undertaken and its provisions harmonized in accordance with the legislative intent and purpose." (citing *Craftsman Builder's Supply v. Butler Mfg.,* 1999 UT 18, ¶ 25, 974 P.2d 1194)).

¶ 10 As we explained in *Gonzalez,* the Utah Legislature enacted section 30–1–4.5 with the aim of preventing welfare fraud by giving Utah's Office of Recovery Services an avenue

---

1. As the court of appeals notes in its memorandum decision in this matter, although Cecil termed his motion a motion to dismiss, "it is properly considered as a motion under Rule 60(b)(4) [motion for relief from void judgment]

and we treat it accordingly." *Clark v. Clark,* 2000 UT App 54, n. 3 2000 WL 33244181 (mem.) (citing *Grossen v. DeWitt,* 1999 UT App 167, ¶ 6, 982 P.2d 581; *In re Baby Boy Doe,* 894 P.2d 1285, 1288 (Utah Ct.App.1995)).

to prevent exclusion of a common law spouse's income when applying for government benefits. *See Gonzalez,* 2000 UT 28 at ¶ 21, 1 P.3d 1074 (citing Floor Debate, remarks of Norman Angus, Director of State Social Services Admin., 47th Utah Leg., Gen. Sess. (Feb. 17, 1987) (Sen. Recording No. 75)). The one-year adjudication requirement was an apparent attempt "to protect the *parties* to a putative marriage from fraud or mistake due to long delays in adjudication." *Id.* (emphasis in original). It seems "the Legislature was concerned with situations in which the couple never intended to be married but where, years later, most likely at the time one of them dies, [someone *not* a party to the marriage] is trying to prove the existence of such a marriage." *Id.* at ¶¶ 21–22 (citing Floor Debate, remarks of Sen. Lyle Hillyard, 47th Utah Leg., Gen. Sess. (Feb. 19, 1987) (Sen. CD No. 81B)).

¶ 11 Therefore, the legislative purpose giving rise to the one-year adjudication requirement has nothing to do with a case such as this where an *individual* attempts to establish an unsolemnized marriage in order to divide marital assets. *See id.* at ¶ 24 (noting that legislative purpose is unrelated to case where individual attempts to establish unsolemnized marriage to claim insurance benefits). We further explained that a statute of limitation not tolled by the *filing* of an action created potential unfairness and would be subject to constitutional challenge, because "an action filed in a timely manner could still fail the limitation period due to delays in discovery or a court's crowded docket." *Id.* We specifically relied on our obligation to construe statutes to avoid potential unconstitutionality. *See id.* at ¶ 30. The construction urged by the intervenor in *Gonzalez* would have raised questions of equal protection, due process, and separation of powers, all of which were avoided by our reading. If, indeed, we misconstrued legislative intent, it is to be expected that the legislature will tell us so. Therefore, under *Gonzalez,* an action to establish an unsolemnized marriage is timely if filed within one year of the termination of the relationship. *Id.*

## II. STATUTORY REQUIREMENTS OF UNSOLEMNIZED MARRIAGE

■ ¶ 12 Cecil challenges the court of appeals' affirmance of the trial court's finding that Linda had met the statutory requirements of section 30–1–4.5. Section 30–1–4.5(1) sets forth the following requirements to establish an unsolemnized marriage:

(1) A marriage which is not solemnized according to this chapter shall be legal and valid if a court or administrative order establishes that it arises out of a contract between two consenting parties who:

(a) are capable of giving consent;

(b) are legally capable of entering a solemnized marriage under the provisions of this chapter;

(c) have cohabited;

(d) mutually assume marital rights, duties, and obligations; and

(e) who hold themselves out as and have acquired a uniform and general reputation as husband and wife.

Utah Code Ann. § 30–1–4.5(1) (1998).

¶ 13 Cecil argues that Linda failed to meet her burden of proving the following statutory requirements: (1) existence of a contract and consent of Cecil; (2) mutual assumption of marital rights, duties, and obligations; and (3) holding themselves out as, and acquisition of a reputation as, husband and wife. *See id.* § 30–1–4.5(1), (1)(a), (d), (e). In addition, Cecil claims that Linda failed to establish cohabitation for the period October 1, 1985 through August 28, 1996. *See id.* § 30–1–4.5(1)(c).

■ ¶ 14 Cecil argues there was insufficient evidence produced at trial to support the trial court's findings. His challenge involves a review of the trial court's application of statutory requirements to factual findings and is a mixed question of law and fact. *See Platts v. Parents Helping Parents,* 947 P.2d 658, 661 (Utah 1997). We apply the same standard used by the court of appeals: a trial court's findings of fact will not be reversed unless they are clearly erroneous, and the trial court's application of the statute to those findings will not be reversed absent an abuse of discretion. *See id.;* Utah R. Civ. P. 52(a).

¶ 15 We agree with the court of appeals that there was considerable evidence adduced at trial on which the trial court could base its findings. First, there was ample evidence that Cecil consented to an unsolemnized marriage and that the Clarks mutually assumed marital rights, duties, and obligations. Cecil and Linda filed joint income tax returns; established joint checking and credit accounts; jointly purchased real estate holdings, including a shared residence; jointly purchased vehicles and other personal belongings together; shared household expenses; and slept in the same bed. Given the substantial amount of evidence showing the parties both consented to a marital relationship, the court of appeals was correct in affirming the trial court's findings.

¶ 16 Second, there was sufficient evidence establishing that Linda and Cecil held themselves out and had acquired a reputation as husband and wife. For example, Linda retained her married name of "Clark," and both Linda and Cecil routinely introduced each other as husband and wife. Furthermore, at least two witnesses, including a neighbor and a former daughter-in-law, believed the Clarks were married. Those witnesses made that assumption because the Clarks were the "[Clark children's] mom and dad" and because the Clarks "acted like a husband and wife would act." Again, the court of appeals was correct in affirming the trial court's finding that the Clarks held themselves out and had a reputation as husband and wife.

¶ 17 Finally, there was ample evidence supporting the trial court's finding of cohabitation. In his attempt to overturn the trial court's factual findings on this point, Cecil claims that during the period from October 1985 until August 28, 1995, he and Linda lived together "off and on." Cecil, however, cites to nothing in the record to support his assertion. Further, even though the parties had a brief separation during December 1995 until June 1996, the record shows that during that time, Cecil stayed overnight at Linda's apartment, sent her cards expressing his love and affection for her, and contributed to her expenses including car repairs and rent. Cecil also argues that both Cecil and Linda had intimate relationships with other people, which evidence refutes the trial court's finding of cohabitation. Essentially, Cecil only asserts his own view of the evidence, and claims the court of appeals erred in failing to reweigh the evidence in his favor. We disagree. The court of appeals was correct in affirming this finding.

¶ 18 We agree with the court of appeals that the trial court's factual findings show that Linda met each of the required elements for establishment of an unsolemnized marriage; therefore, the trial court did not abuse its discretion in its application of the statute. The court of appeals was correct in affirming the trial court's ruling that an unsolemnized marriage was established.

### III. MOTION FOR RELIEF FROM JUDGMENT

¶ 19 Cecil challenges the court of appeals' reversal of the trial court's granting of Cecil's motion for relief from judgment. In reviewing the trial court's interpretation of section 30–1–4.5, the court of appeals applied a correctness standard, *see Clark v. Clark*, 2000 UT App 54, 2000 WL 33244181 (mem.), and we apply the same standard. Relying on *In re Marriage of Gonzalez*, 2000 UT 28, ¶ 30, 1 P.3d 1074, the court of appeals ruled that the trial court had jurisdiction to enter the order establishing an unsolemnized marriage because Linda filed her petition well within one year of the termination of the marriage. *See Clark*, 2000 UT App 54, 2000 WL 33244181.

¶ 20 We note that in *Gonzalez* we did not decide the issue of whether the requirement of section 30–1–4.5(2) requiring only the *filing* of an action, would apply to an action involving a divorce. *See* 2000 UT 28 at ¶ 29 n. 7, 1 P.3d 1074. We distinguished *Bunch v. Englehorn*, 906 P.2d 918 (Utah Ct.App.1995), where the court of appeals held that, in a case involving a divorce, a petition for establishment of marriage must be brought and *decided* within a year of the relationship's termination. *See Gonzalez*, 2000 UT 28 at ¶ 29 n. 7, 1 P.3d 1074 (citing *Bunch*, 906 P.2d at 920–21). In this case, however, unlike *Gonzalez*, Linda petitions for both establish-

ment of an unsolemnized marriage *and* a divorce. Therefore, now that the issue is squarely before us, we expressly overrule *Bunch v. Englehorn*, 906 P.2d 918, and hold that *Gonzalez* applies equally to actions to establish a marriage and to actions where establishment is sought in order to obtain a divorce.

¶ 21 In the instant case, because the trial court found that the Clarks' unsolemnized marriage terminated on August 28, 1996, the statute of limitation began running on that date. Therefore, Linda's filing of her action in October 1996 was well within the statutory period. As we noted in *Gonzalez*, we did not, and still do not, believe that the legislature meant to place the burden of crowded court dockets and other matters completely beyond the petitioner's control, solely on the petitioner. *See Gonzalez*, 2000 UT 28 at ¶ 24, 1 P.3d 1074.

¶ 22 In fact, the procedural history of Linda's action against Cecil clearly demonstrates the unfairness of a statute of limitation not tolled by the filing of an action. Linda filed her action in October 1996, within two months of the termination of the marital relationship. However, Cecil delayed discovery for at least two months, even ignoring two motions to compel. During that time Linda diligently attempted to obtain an order establishing an unsolemnized marriage. The trial was held and findings were made within one year of the termination date. However, due to further delays caused at least in part by Cecil, the final order was not entered until later than one year past the termination date of the unsolemnized marriage.

¶ 23 Based on our precedent in *Gonzalez* and our review of the merits, we affirm the court of appeals' decision in all respects.

WILKINS, Justice, concurring in the result:

¶ 24 I concur in the result reached in the main opinion. I write separately to explain my concurrence.

¶ 25 The court's decision today relies upon our decision in *In re Marriage of Gonzalez*, 2000 UT 28, 1 P.3d 1074, issued just over one year ago. Under the *Gonzalez* holding I see

no other possible result. In both this case and *Gonzalez*, the party seeking to establish the marriage was afforded an opportunity to do so that began when the relationship with their partner began, and ended one year after the termination of that relationship. In both cases, the limitation imposed under section 30–1–4.5 encompassed a period of years, not just the single year following the end of the relationship. It included all of the time the parties chose to live as "married" persons.

¶ 26 The statute interpreted in *Gonzalez* and again applied here, section 30–1–4.5 of the Utah Code, requires that the "determination or establishment of a marriage under this section must occur during the relationship . . . or within one year following the termination of that relationship." Utah Code Ann. § 30–1–4.5(2) (1998). By its terms, it appears not only to require the filing of such an action, but also determination or establishment of the relationship within that time. Had I been part of the *Gonzalez* court, I would have concurred in the dissenting opinion of Justice Russon. *See Gonzalez*, 2000 UT 28 at ¶¶ 51–61, 1 P.3d 1074. I would have agreed that the language of the statute was eminently clear: To receive the benefits of the law relating to married persons in this state, the legislature has required persons either to undertake the legal formalities of marriage required by statute, *see* Utah Code Ann. §§ 30–1–1 to –39 (1998), or to act with sufficient diligence and foresight to have the marriage determined, conclusively, by a court of competent jurisdiction during the period of the relationship plus one additional year. Neither Juanita Gonzalez nor Linda Clark did so. Both began so late that the process could not be completed within the statutory limitation.

¶ 27 However, in *Gonzalez* we held that the requirements of section 30–1–4.5 are met by the *filing* of such an action within the term of the relationship plus one year. *Gonzalez*, 2000 UT 28 at ¶ 25, 1 P.3d 1074. Until changed by this court or by action of the legislature, that is the law. And while a majority of the current members of this court may well agree that *Gonzalez* was incorrectly decided, there are higher values at

stake than the correction of what might be seen as a single erroneous holding.

¶ 28 In a society controlled by the rule of law, citizens are entitled to a considerable measure of stability in that law. This is especially true when the law is made by judges as opposed to the legislature. It is the legislature to which our citizens have a general right of redress and petition when they feel the law has been incorrectly decided. It is the legislature that is designed to seek public input on issues of public policy. Courts are ill-suited to evaluate and impose broad policy mandates on society. Notwithstanding the contrary belief of many, including many judges, I am of the opinion that it is not our role to correct perceived errors in legislative policy. Our task is to apply statutory enactments as best we are able to understand them, and precisely as written if possible. This is true even if literal application of the statutory language does not produce a result we admire, or would advocate if we were members of the legislature. If we find the result to be unsatisfying, our obligation ends in applying the language as written, and pointing out the possibility of modification to the legislature for its consideration. Unless statutory language violates the constitution, courts have no obligation to "fix" anything the legislature chooses to do. That is better left to the legislative process and its closer relationship with citizens.

¶ 29 However, the case before us is controlled by *Gonzalez*. The court has already spoken as to the interpretation of the limitation period contained in the statute. To me, the only thing worse than a court seeking to act as a legislative body in modifying the law is a court that cannot be counted on to maintain stability and consistency in application of the law. Once this court has spoken on an issue, changing that pronouncement should occur only when faced with circumstances clearly establishing that the prior rule was erroneous, is not easily subject to legislative remedy, and has failed the test of

time. The decision in *Gonzalez* is barely a year old, is easily subject to legislative correction if desired, and appears to have worked little harm to society generally to date. Although I think it was incorrect at the time, I see no compelling reason to change the prior rule announced in *Gonzalez*, and I therefore concur in the result reached in the main opinion. I do so purely on the basis of stare decisis, not on the basis of agreement with the logic or policy expressed.

¶ 30 Justice DURRANT concurs in Justice WILKINS' concurring opinion.

RUSSON, Associate Chief Justice, dissenting:

¶ 31 I dissent for the same reasons I dissented in *In re Marriage of Gonzalez*,[1] the case relied upon by the majority opinion. We may not like the result of the statute in question, but it is not our function to rewrite the statute for a result more to our liking. The statute in question is perfectly clear: In order for an unsolemnized marriage to be legal and valid, a court or administrative order recognizing such marriage *must* occur during the relationship or within one year following termination of that relationship.[2] The exact wording of the statute states:

> The determination or establishment of a marriage under this section [by court or administrative order] *must* occur during the relationship described in subsection (1), or within one year following the termination of that relationship . . . .

Utah Code Ann. § 30–1–4.5(2) (1998) (emphasis added).

¶ 32 Despite the plain language of the above statute, the majority opinion today reaffirms this court's holding in *In re Marriage of Gonzalez*, construing subsection two of section 30–1–4.5 as requiring only the *filing* of a petition for adjudication of marriage within one year after the termination of the relationship.[3] In doing so, the majority

---

1. 2000 UT 28, ¶ 52, 1 P.3d 1074 (Russon, J., dissenting, joined by Howe, C.J.).

2. Obviously, the reason for the statute is to require an order establishing marriage during the relationship, but protect children conceived during the relationship but born after its termination.

3. I fully understand and respect the principle of stare decisis, which gives stability to our body of law. However, we should not perpetuate a law that is clearly wrong for the sake of stare decisis,

opinion ignores the well-accepted principle of statutory interpretation that courts must look to the plain language of the statutes and apply the same regardless of whether a better result could be obtained by rewording the statute. Indeed, this court has consistently held that

> "[t]he primary rule of statutory interpretation is to give effect to the intent of the legislature in light of the purpose the statute was meant to achieve." *Sullivan v. Scoular Grain Co. of Utah*, 853 P.2d 877, 880 (Utah 1993). To discover that intent, *we look first to the plain language of the statute.* *State v. Larsen*, 865 P.2d 1355, 1357 (Utah 1993).... *"Only when we find ambiguity in the statute's plain language need we seek guidance from the legislative history and relevant policy considerations."* *World Peace Movement v. Newspaper Agency Corp.*, 879 P.2d 253, 259 (Utah 1994).

*Harmon City, Inc. v. Nielsen & Senior*, 907 P.2d 1162, 1167–68 (Utah 1995) (emphasis added); *see also, e.g., Dairy Prod. Servs., Inc. v. Wellsville*, 2000 UT 81, ¶ 20, 13 P.3d 581 ("When we interpret a statute, we must look first to the statute's plain language to determine the legislative intent and we look no further if the language is unambiguous on its face."); *State v. Burns*, 2000 UT 56, ¶ 25, 4 P.3d 795 ("[O]ur primary goal in interpreting statutes is to give effect to the legislative intent, as evidenced by the plain language, in light of the purpose the statute was meant to achieve. We need look beyond the plain language only if we find some ambiguity." (citation omitted)); *State v. Thurman*, 911 P.2d 371, 373 (Utah 1996) ("When interpreting a section of the Utah Code, we are guided by the principle that a statute is generally construed according to its plain language. Only if we find ambiguity in the statute's plain language need we resort to other methods of statutory interpretation." (citation omitted)); *Hanchett v. Burbidge*, 59 Utah 127, 135, 202 P. 377, 380 (1921) ("When language is clear and unambiguous, it must be held to mean what it expresses, and no room is left for construction.").

¶ 33 Moreover, the above principles of statutory interpretation have been consistently applied in other jurisdictions. As is well-stated in *American Jurisprudence:*

> That a statute will produce a hardship which probably was not within the contemplation of the legislature is not sufficient basis for departing from the terms thereof. A court may not extend a statute, or construe it otherwise than as written, to avoid a hardship. If the law as written works a hardship in a special class of cases, *the remedy is to be effected by the legislature, and not by judicial action in the guise of interpretation. Hence, where the language of a statute is clear and unambiguous and the intention plain, it is the duty of the court to expound the statute as it stands, even if the consequence is a hardship, or if the statute is thereby rendered susceptible to abuse.*

73 Am.Jur.2d *Statutes* § 264 (1974) (emphasis added); *see also Deputy v. Du Pont*, 308 U.S. 488, 498, 60 S.Ct. 363, 84 L.Ed. 416 (1940) (stating that the plain meaning of a statute cannot be sacrificed for the exigencies of a hard case); *Rigopoulos v. Kervan*, 140 F.2d 506, 507 (2d Cir.1943) (stating that harshness is no escape from plain statutory language); 82 C.J.S. *Statutes* § 318 (1999) ("If the language of the statute is clear and expresses the intention of the legislature, the

---

especially where the said case law is less than one year old and was a three-two decision. This court has "not hesitated ... to reverse case law when we are firmly convinced that we have erred earlier." *Staker v. Ainsworth*, 785 P.2d 417, 424 n. 5 (Utah 1990); *see, e.g., State v. Menzies*, 889 P.2d 393, 399 (Utah 1994); *State v. Tuttle*, 713 P.2d 703, 704 (Utah 1985).

As Justice Felix Frankfurter aptly noted:

We recognize that *stare decisis* embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But *stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience

. . . .

This Court, unlike the House of Lords, has from the beginning rejected a doctrine of disability at self-correction.

*Helvering v. Hallock*, 309 U.S. 106, 119, 121, 60 S.Ct. 444, 84 L.Ed. 604 (1940).

statute must be construed to give effect to that intention regardless of the consequences, even though it may cause a hardship.").

¶ 34 Accordingly, although section 30–1–4.5's requirement relating to conclusion, rather than commencement, of legal proceedings may be unusual, its language is clear and unambiguous—leaving no room for construction. Therefore, because it is undisputed that the court order establishing a common law marriage in the instant case was not entered within the one-year adjudication period set forth by section 30–1–4.5(2), I would overrule our recent decision in *In re Marriage of Gonzalez* and, in doing so, reverse the court of appeals' decision concerning Cecil's motion for relief from judgment due to lack of jurisdiction.

¶ 35 Chief Justice HOWE concurs in Associate Chief Justice RUSSON's dissenting opinion.

